**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| SEAN SHEFFLER,<br><br>on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICOLD LOGISTICS, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Sean Sheffler ("Plaintiff") brings this Class Action Complaint against Americold Logistics, LLC ("Americold" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsels' investigations, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personal identifiable information that Defendant required from its current and former employees as a condition of employment, including name, address, Social Security number, driver's license/state ID number, passport number, financial account information (*e.g.*, bank account number, credit card number), and employment-related health insurance and medical information (collectively, "personal identifiable information" or "PII").

2. According to its website, for 120 years, Defendant "has been the leader in providing technology-based engineered solutions for the temperature-controlled supply chain industry."[1]

3. Plaintiff's employment with Defendant ended more than three years before the events described below.

4. Prior to and through April 26, 2023, Defendant obtained the PII of Plaintiff and Class Members, including the PII of Plaintiff, and stored that PII, unencrypted, in an Internet-accessible environment on Defendant's network.

5. On or around April 26, 2023, Defendant became aware of a cybersecurity incident that involved the deployment of malware on certain systems (the "Data Breach").

6. Defendant determined that, during the Data Breach, an unauthorized party was able to remove some data from its network, including information about more than 129,000 current or former employees of Defendant and their dependents.

7. In a May 4, 2023 filing with the U.S. Securities and Exchange Commission, Defendant stated that "[w]hile our full investigation into the April 2023 cyber incident is still ongoing, our initial examination revealed unauthorized

[1] *See* https://www.americold.com/ (last visited Mar. Dec. 23, 2023).

access to personal information."[2]

8. On or around July 20, 2023, reports began surfacing on the Internet that the Cactus ransomware group was the attacker, that the Data Breach involved "at least 6GB" of data, including a "huge amount of personal data," and that leaked data included "sample with proof of the exfiltrated data."[3]

9. Another report stated that the Cactus ransomware group had "leaked a 6GB archive of accounting and finance documents allegedly stolen from Americold's network, including private and confidential information" and that "[t]he ransomware group also plans to release human resources, legal, company audit information, customer documents, and accident reports."[4]

10. On or around December 8, 2023, more than seven months after it learned of the Data Breach, Defendant began notifying various states Attorneys General of the Data Breach.

11. On or around December 8, 2023, more than seven months after it

---

[2] Form 10-Q, *available at* https://www.sec.gov/Archives/edgar/data/1455863/000162828023015697/art-20230331.htm.

[3] Hackmanac, News – Hacks of Today 20/07/2023, *available at* https://hackmanac.com/news/hacks-of-today-21-07-2023 (last visited Dec. 23, 2023).

[4] *See* https://www.bleepingcomputer.com/news/security/cold-storage-giant-americold-discloses-data-breach-after-april-malware-attack/ (last visited Dec. 23, 2023).

learned of the Data Breach, Defendant began notifying Plaintiff and Class Members of the Data Breach.

12. By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendant admits that the unencrypted PII exposed to "unauthorized activity" included name, address, Social Security number, driver's license/state ID number, passport number, financial account information (e.g., bank account number, credit card number), and employment-related health insurance and medical information.

13. The exposed PII of Plaintiff and Class Members can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

14. This PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiff and Class Members. In addition to Defendant's failure to prevent the Data Breach, after discovering the breach, Defendant waited several months to report it to the states' Attorneys General and affected individuals. Defendant has also purposefully maintained secret the specific vulnerabilities and root causes of the breach and has not informed Plaintiff

and Class Members of that information.

15. As a result of this delayed response, Plaintiff and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

16. Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

17. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (iv) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

18. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

19. Plaintiff Sean Sheffler is a Citizen of Ohio residing in Defiance County, Ohio.

20. Defendant Americold Logistics, LLC is a limited liability company organized under the laws of Delaware, headquartered at 10 Glenlake Parkway NE, 600 South Tower, Atlanta, Georgia, with its principal place of business in Atlanta, Georgia.

21. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

22. All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

## III. JURISDICTION AND VENUE

23. This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

24. Under 28 U.S.C. § 1332(d)(10), Defendant is a citizen of Delaware and Georgia because it is a Delaware limited liability company and its principal place of business is in Atlanta, Georgia.

25. The Northern District of Georgia has personal jurisdiction over Defendant named in this action because Defendant and/or its parents or affiliates are

headquartered in this District and Defendant conduct substantial business in Georgia and this District through its headquarters, offices, parents, and affiliates.

26. Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

***Background***

27. According to Defendant's website, "[f]or 120 years, [Defendant] has been the leader in providing technology-based engineered solutions for the temperature-controlled supply chain industry."[5]

28. Plaintiff and Class Members employed by Defendant were required to provide Defendant sensitive and confidential information for themselves and their beneficiaries and dependents, including names, Social Security numbers, and other personal identifiable information, which is static, does not change, and can be used to commit myriad financial crimes.

29. Plaintiff and Class Members, as current and former employees and their beneficiaries and dependents, relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes

[5] *See* https://www.americold.com/ (last visited December 23, 2023).

only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their PII.

30. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties.

***The Data Breach***

31. On or about December 8, 2023, Defendant sent Plaintiff and other Class Members a *Notice of Data Breach*.[6] Defendant informed Plaintiff and other Class Members that:

> **What Happened**
>
> On April 26, 2023, Americold became aware of a cybersecurity incident that involved the deployment of malware on certain systems. Upon discovery, Americold engaged outside counsel, which launched a forensic investigation with the assistance of a leading cybersecurity firm and reported the matter to law enforcement. Americold subsequently determined that, on April 26, 2023, an unauthorized party was able to remove some data from the network. Based on the comprehensive data analysis that was performed and ultimately completed on November 8, 2023, we were able to determine what information was affected and to whom the information related. As a result of this review, it appears that some of your personal information may have been involved.
>
> **What Information Was Involved**
>
> The personal information involved may have included name, address, Social Security number, driver's license/state ID number, passport number, financial

[6] Exhibit 1 (*Notice of Data Breach* sent to Plaintiff Sheffler).

> account information (e.g., bank account number, credit card number), and employment-related health insurance and medical information. Please note that not all data elements were involved for all individuals.
>
> **What We Are Doing**
>
> Americold takes the protection of personal information seriously. As soon as we discovered the incident, we immediately launched a forensic investigation, took steps to mitigate and remediate the incident and to help prevent further unauthorized activity, and contacted law enforcement. We have and continue to enhance our security controls as appropriate to minimize the risk of any similar event in the future.[7]

32. On or about December 8, 2023, Defendant notified various state Attorneys General of the Data Breach. Defendant also provided the Attorneys General with "sample" notices of the Data Breach that suggest the information exposed in the Data Breach included name, address, Social Security number, driver's license/state ID number, passport number, financial account information (*e.g.*, bank account number, credit card number), and employment-related health insurance and medical information.[8]

33. Defendant admitted in the *Notice of Data Breach*, the letters to the Attorneys General, and the "sample" notices of the Data Breach that unauthorized third persons accessed files that contained sensitive information about Defendant's

---

[7] *Id.* at 1.

[8] Exhibit 2 (sample *Notice of Data Breach*).

current and former employees and their dependents, including name, address, Social Security number, driver's license/state ID number, passport number, financial account information (e.g., bank account number, credit card number), and employment-related health insurance and medical information.

34. In response to the Data Breach, Defendant claims that "we immediately launched a forensic investigation, took steps to mitigate and remediate the incident and to help prevent further unauthorized activity, and contacted law enforcement. We have and continue to enhance our security controls as appropriate to minimize the risk of any similar event in the future."[9] However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiff and Class Members, who retain a vested interest in ensuring that their information remains protected.

35. The unencrypted PII of Plaintiff and Class Members may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

36. Defendant did not use reasonable security procedures and practices

[9] Exhibit 1; Exhibit 2.

appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiff and Class Members, causing the exposure of PII for approximately 129,000 individuals.

37. On March 29, 2018, more than two years before the Data Breach, Defendant filed an annual report with the Securities Exchange Commission ("SEC") that acknowledged the following:

> We may also be subject to cybersecurity attacks and other intentional hacking. These attacks could include attempts to gain unauthorized access to our data and computer systems. In particular, as discussed further below, our operations have been, and may in the future be, subject to ransomware or cyber-extortion attacks, which could significantly disrupt our operations. Generally, such attacks involve restricting access to computer systems or vital data. We employ a number of measures to prevent, detect and mitigate these threats, which include password protection, frequent password changes, firewall detection systems, frequent backups, a redundant data system for core applications and annual penetration testing; however, there is no guarantee such efforts will be successful in preventing a cybersecurity attack. A cybersecurity attack or breach could compromise the confidential information of our associates, customers and vendors.[10]

38. In Defendant's parent's March 29, 2018 SEC filing, it acknowledged that (i) its business was at risk from, and may be impacted by, cybersecurity attacks, (ii) such cyberattacks could include attempts to gain unauthorized access to

---

[10] *See* Form 10-K (Mar. 1, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1455863/000162828021003613/art-20201231.htm (last visited Dec. 23, 2023).

Defendant's data and computer systems, (iii) Defendant was at risk of cybersecurity attacks from very sophisticated hacking organizations, (iv) such cybersecurity attacks could compromise the confidential information of Defendant's employees, and (v) Defendant had a duty to protect such confidential employee information from a cybersecurity attack.

39. On April 22, 2019, more than a year before the Data Breach, an Americold employee published on Americold's website an article titled "Cyber security: Is your company at risk?" in which Americold acknowledged that

a. "***logistics companies*** [such as Defendant] ***are not immune***" to cybercriminal activity,

b. "tens of millions of customers have had business and ***personal data exposed*** in highly-publicized cases," and

c. "***ransomware attacks*** increased by over 250% in 2017 compared to 2016."[11]

40. Defendant's April 22, 2019 publication confirms that, more than three years before the Data Breach, Defendant acknowledged a foreseeable risk of ransomware attacks and the resulting exfiltration and exposure of personal data and that such risk applied to logistics companies such as Defendant.

---

[11] Exhibit 3, Americold – Cyber security: Is your company at risk? (Apr. 22, 2019) (emphasis added), *available at* https://blog.americold.com/blog/cyber-security-is-your-company-at-risk (last visited Dec. 23, 2023).

41. Because Defendant had a duty to protect Plaintiff's Social Security numbers and other sensitive PII, Defendant should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

42. In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

43. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ***ransomware actors have also targeted*** health care organizations, ***industrial companies***, and the transportation sector."[12]

44. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "***[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies***. They breach

[12] FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations (Oct. 2, 2019) (emphasis added), *available at* https://www.ic3.gov/Media/Y2019/PSA191002 (last visited Dec. 23, 2023).

networks, use specialized tools to maximize damage, ***leak corporate information on dark web portals***, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[13]

45. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting industrial companies such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of big companies such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

46. In March 2021, Defendant's parent, Americold Realty Trust, announced a data breach that occurred in October and November 2020 and impacted 141,351 current and former employees and their beneficiaries and dependents (the "2020 Data Breach").

47. The 2020 Data Breach impacted Social Security numbers and other personally identifiable information that were stored in an Internet-accessible environment on Defendant's parent's network, which may be the same network

[13] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Dec. 23, 2023) (emphasis added), *available at* https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Dec. 23, 2023).

where Defendant stored the PII of Plaintiff and Class Members.

48. In March 2021, a class action lawsuit was filed against Defendant's parent regarding the 2020 Data Breach. *See Sheffler, et al. v. Americold Realty Trust*, No. 1:21-cv-01075-TCB (N.D. Ga.).

49. In light of Defendant's parent's March 29, 2018 SEC filing, Defendant's April 22, 2019 publication on its website, the information readily available and accessible on the internet before the Data Breach, and the 2020 Data Breach, Defendant had reason to be on guard for the type of ransomware attack underlying the Data Breach and Defendant's type of business had cause to be particularly on guard against such an attack.

50. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiff's Social Security numbers and other sensitive PII could be accessed, exfiltrated, and published as the result of a ransomware attack.

51. Prior to the Data Breach, Defendant knew or should have known that it should have encrypted the Social Security numbers and other sensitive PII to protect against their publication and misuse in the event of a ransomware attack.

52. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions

for protection."[14]

53. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share

[14] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Dec. 23, 2023).

permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

54. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

[15] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[16]

55. Given that Defendant was storing the PII of approximately 129,000

---

[16] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Dec. 23, 2023).

individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

56. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of approximately 129,000 individuals, including Plaintiff and Class Members.

***Defendant Acquires, Collects, and Stores the PII of Plaintiff and Class Members.***

57. Defendant acquired, collected, and stored the PII of Plaintiff and Class Members in an Internet-accessible environment.

58. As a condition of maintaining employment with Defendant, Defendant requires that its employees entrust Defendant with highly confidential PII.

59. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

60. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***Securing PII and Preventing Breaches***

61. Defendant could have prevented this Data Breach by properly securing

and encrypting the files and file servers containing the PII of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data, especially decade-old data from former employees and their beneficiaries and dependents.

62. Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

63. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

64. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

65. The ramifications of Defendant's failure to keep secure the PII of

[17] 17 C.F.R. § 248.201 (2013).

[18] *Id.*

Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Value of Personal Identifiable Information***

66. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

67. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of

[19] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Dec. 23, 2023).

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Dec. 23, 2023).

[21] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Dec. 23, 2023).

fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

68. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

69. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number,

---

[22] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Dec. 23, 2023).

so all of that old bad information is quickly inherited into the new Social Security number."[23]

70. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change— name, address, Social Security number, driver's license/state ID number, passport number, financial account information (e.g., bank account number, credit card number), and employment-related health insurance and medical information.

71. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[24]

---

[23] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed Dec. 23, 2023).

[24] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Dec. 23, 2023).

72. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

73. The fraudulent activity resulting from the Data Breach may not come to light for years.

74. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

75. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers and dates of birth, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and

---

[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last accessed Dec. 23, 2023).

Class Members as a result of a breach.

76. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

77. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's file servers, amounting to potentially tens or hundreds of thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

78. To date, Defendant has offered Plaintiff and Class Members only two years of identity monitoring services through Kroll. The offered service is inadequate to protect Plaintiff and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

79. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

***Plaintiff Sean Sheffler's Experience***

80. In or around November 2019, Plaintiff Sheffler worked for Defendant or its affiliate in Napoleon, Ohio. As a condition of employment, Defendant required

that he provide and/or entrust his PII, including his name, Social Security number, and date of birth.

81. Plaintiff Sheffler received Defendant's Notice of Data Breach, dated December 8, 2023, on or about that date. The notice stated that Plaintiff Sheffler's name, address, Social Security number, driver's license/state ID number, passport number, financial account information (e.g., bank account number, credit card number), and employment-related health insurance and medical information may have been exposed.

82. As a result of the Data Breach notice, Plaintiff Sheffler spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

83. Additionally, Plaintiff Sheffler is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

84. Plaintiff Sheffler stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

85. Plaintiff Sheffler suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff

Sheffler entrusted to Defendant for the purpose of his employment, which was compromised in and as a result of the Data Breach.

86. Plaintiff Sheffler suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

87. Plaintiff Sheffler has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name and date of birth, being placed in the hands of unauthorized third parties and possibly criminals.

88. Plaintiff Sheffler has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ALLEGATIONS

89. Plaintiff brings this nationwide class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

90. The Nationwide Class that Plaintiff seek to represent is defined as follows:

> All individuals whose PII was compromised in the data breach that is the subject of the Notice of Data Breach that

> Defendant sent to Plaintiff and other Class Members on or around December 8, 2023 (the "Nationwide Class").

91. Pursuant to Rule 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate subclass, defined as follows:

> All current and former employees of Defendant whose PII was compromised in the data breach that is the subject of the Notice of Data Breach that Defendant sent to Plaintiff and other Class Members on or around December 8, 2023 (the "Employees Class").

92. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

93. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

94. <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class (the "Class") are so numerous that joinder of all members is impracticable. Defendant has identified thousands of current and former employees, and beneficiaries and

dependents thereof, whose PII may have been improperly accessed in the Data Breach, and the Class is apparently identifiable within Defendant's records. Defendant advised Maine Attorney General Frey that the Data Breach affected 129,611 individuals.

95. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;
b. Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;
c. Whether Defendant had duties not to use the PII of Plaintiff and Class Members for non-business purposes;
d. Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;
e. Whether and when Defendant actually learned of the Data Breach;
f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;
g. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

l. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

96. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

97. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on

grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

98. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

99. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action

treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

100. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

101. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant

manageability problems with prosecuting this lawsuit as a class action.

102. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

103. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

104. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

105. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and

safeguarding their PII;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members; and,

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

106. Plaintiff and the Nationwide Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 107.

107. As a condition of their employment with Defendant, Defendant's current and former employees were obligated to provide Defendant with certain PII, including their names, Social Security numbers, and dates of birth, and those of their beneficiaries and dependents.

108. Plaintiff and the Nationwide Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

109. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Nationwide Class could and would suffer if the PII were wrongfully disclosed.

110. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Nationwide Class involved an unreasonable risk of harm to Plaintiff and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

111. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiff and the Nationwide Class in Defendant's possession was adequately secured and protected.

112. Defendant also had a duty to exercise appropriate clearinghouse practices to remove former employees' PII, and that of their beneficiaries and dependents, it was no longer required to retain pursuant to regulations.

113. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiff and the Nationwide Class.

114. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and the Nationwide Class. That special relationship arose because Plaintiff and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of employment with the company.

115. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Nationwide Class.

116. A breach of security, unauthorized access, and resulting injury to

Plaintiff and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

117. Plaintiff and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

118. Defendant's own conduct created a foreseeable risk of harm to Plaintiff and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiff and the Nationwide Class, including basic encryption techniques freely available to Defendant.

119. Plaintiff and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

120. Defendant was in a position to protect against the harm suffered by Plaintiff and the Nationwide Class as a result of the Data Breach.

121. Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Nationwide Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data

that were compromised and when. Such notice was necessary to allow Plaintiff and the Nationwide Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

122. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and the Nationwide Class.

123. Defendant has admitted that the PII of Plaintiff and the Nationwide Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

124. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiff and the Nationwide Class during the time the PII was within Defendant's possession or control.

125. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

126. Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiff and the Nationwide Class in the face of increased risk of theft.

127. Defendant, through its actions and/or omissions, unlawfully breached

its duty to Plaintiff and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former employees' PII, and that of their beneficiaries and dependents.

128. Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove former employees' PII, and that of their beneficiaries and dependents, it was no longer required to retain pursuant to regulations.

129. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and the Nationwide Class the existence and scope of the Data Breach.

130. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Nationwide Class, the PII of Plaintiff and the Nationwide Class would not have been compromised.

131. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Nationwide Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Nationwide Class. The PII of Plaintiff and the Nationwide Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

132. As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class have suffered and will suffer injury, including but not

limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiff and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Nationwide Class.

133. As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

134. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

135. As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Employees Class)**

136. Plaintiff and the Employees Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 107.

137. Defendant's Privacy Notice, which applies to "applicants for employment," provides that Defendant "collect[s] or obtain[s] Personal Data about you … when you submit a job application."[26]

[26] Exhibit 4 at 1.

138. Under "Data security," Defendant's Privacy Notice states that Defendant "implement[s] appropriate technical and organizational security measures to protect your Personal Data."[27]

139. Under "Data security," Defendant's Privacy Notice states that Defendant "ha[s] implemented appropriate technical and organizational security measures designed to protect your Personal Data against accidental or unlawful destruction, loss, ***unauthorized disclosure***, ***unauthorized access***, and other unlawful or unauthorized forms of Processing, in accordance with applicable law."[28]

140. In applying for employment with Defendant, each Plaintiff submitted their PII, including their Social Security numbers, to Defendant.

141. The Privacy Notice confirms that Defendant intended to bind itself to protect the PII, including Social Security numbers, that each Plaintiff submitted to Defendant in applying for employment with Defendant.

142. Defendant required Plaintiff and the Employees Class to provide their personal information, including name, address, Social Security number, driver's license/state ID number, passport number, financial account information (e.g., bank

[27] *Id.* at 7.

[28] *Id.*

account number, credit card number), and employment-related health insurance and medical information.

143. As a condition of their employment with Defendant, Plaintiff and the Employees Class provided their personal and financial information, including but not limited to the personal information of their beneficiaries and dependents. In so doing, Plaintiff and the Employees Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Employees Class if their data had been breached and compromised or stolen.

144. Plaintiff and the Employees Class fully performed their obligations under the implied contracts with Defendant.

145. Defendant breached the implied contracts it made with Plaintiff and the Employees Class by failing to implement appropriate technical and organizational security measures designed to protect their PII against accidental or unlawful unauthorized disclosure or unauthorized access and otherwise failing to safeguard and protect their personal and financial information, including the personal information of their beneficiaries and dependents, and by failing to provide timely and accurate notice to them that personal and financial information, along with the

personal information of their beneficiaries and dependents, was compromised as a result of the data breach.

146. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Employees Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

147. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Nationwide Class and the Employees Class and appointing Plaintiff and his Counsel to represent each such Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to

other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as

allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: December 23, 2023

Respectfully Submitted,

/s/ Gregory Bosseler
**MORGAN & MORGAN, P.A.**
Gregory Bosseler
191 Peachtree Street N.E., Suite 4200
P.O. Box 57007
Atlanta, Georgia 30343-1007
gbosseler@forthepeople.com

John A. Yanchunis*
**MORGAN & MORGAN COMPLEX BUSINESS DIVISION**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com

Ryan D. Maxey*
**MAXEY LAW FIRM, P.A.**
107 N. 11th St. #402
Tampa, FL 33602
(813) 448-1125
ryan@ maxeyfirm.com

*Attorneys for Plaintiff and the Proposed Class*

**pro hac vice* admission pending

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2023, the foregoing document was filed with the Clerk by using the CM/ECF system, which will send notification to all attorneys of record in this matter.

/s/ Gregory Bosseler
Gregory Bosseler